IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 06-cv-01567-LTB-BNB

CHRISTINA GARCIA, pro se,

Plaintiff,

v.

IMANAGE, INC.,

Defendant.

_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

This matter is before me on the Motion to Dismiss [Doc. #12, filed 9/29/06] (the

"Motion") by iManage, Inc.[1]  For the following reasons, I respectfully RECOMMEND that the

Motion be GRANTED and that the Complaint be dismissed in its entirety.

### I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*.  I must liberally construe the pleadings of a *pro se*

plaintiff.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972).  Nevertheless, I cannot act as advocate

for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of

Civil Procedure.  Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion to dismiss, the court must accept the plaintiff's well-pleaded

allegations as true and must construe all reasonable inferences in favor of the plaintiff.  City of Los

Angeles v. Preferred Communications, Inc., 476 U.S. 488, 493 (1986); Mitchell v. King, 537 F.2d

_____

[1]On July 23, 2007, the Complaint was dismissed as to defendants Panjwani, Culhane, and
Mohammadi [Doc. #23].

385, 386 (10ᵗʰ Cir. 1976).  The complaint must contain specific allegations sufficient to establish

that it plausibly supports a claim for relief.  Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215

n.2 (10th Cir. 2007).  "The issue is not whether a plaintiff will ultimately prevail but whether the

claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232,

236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).

## II.  BACKGROUND

This case was removed from the Denver District Court on August 9, 2006.  The

Complaint contains the following allegations:

1.   The plaintiff is a resident of Colorado who purchased in the secondary market shares

of stock in iManage, Inc. ("iManage").  *Complaint*, ¶¶ 7, 9.

2.   iManage was a software company based in California.  Id. at ¶ 10.  iManage became a

pubic company through an initial public offering ("IPO").  Shares sold in an IPO must be

registered with the Securities Exchange Commission ("SEC").  Id. at ¶¶ 1, 35, 38; 15 U.S.C. §

77e.

3.   The underwriting of IPOs in the normal course of business is undertaken at some risk

by investment banks.  Underwriters typically consist of a group of representative underwriters (a

"syndicate").  In a typical "firm commitment" underwriting, the underwriting syndicate commits

to the issuer that it will buy all of the shares offered upon the effective date of the offering.  The

underwriters then sell the shares to customers pursuant to previously obtained indications of

interest.  The underwriters run the risk of not being able to sell the shares.  *Complaint*, ¶ 18.

4.   The IPO process starts when the issuer selects an investment banker to lead the

underwriting and sale of the issuer's common stock.  The issuer then signs a letter of intent to go

public.  Id. at ¶ 29.  Afterwards, the issuer enters a "quiet period" during which neither the issuer

nor its underwriters are permitted to make forward-looking statements or release non-routine

information that is not contained in the prospectus.  Id. at ¶ 30.

5.   Early on in this process, the issuer typically discloses the anticipated number of shares

to be sold to the investing public and the IPO share price range.  This information is also found in

a preliminary prospectus which is distributed to investment bankers in aid of an anticipated

marketing campaign.  Id. at ¶ 32.

6.   The highlight of the pre-IPO marketing campaign is the "Road Show."  During a Road

Show, representatives of the lead underwriter and the issuer travel to various cities and meet with

potential investors who may have an interest in purchasing shares in the IPO.  Id. at ¶ 33.

7.   iManage filed with the SEC a registration statement ("Registration Statement") and a

prospectus ("Prospectus") which was declared effective by the SEC on or about November 17,

1999.  Id. at ¶ 4.

8.   Robertson Stephens, the underwriter of iManage's IPO (the "Underwriter"), created

an artificial demand for iManage stock by conditioning share allocations in the IPO upon the

requirement that customers agree to purchase shares of iManage in the aftermarket.  Id. at ¶ 3.  In

some instances, the customers were required to make the purchases at prearranged, escalating

prices.  These arrangements are referred to as Tie-in Agreements.  Id.

9.   In order to obtain shares of the iManage IPO from the Underwriter, one customer was

required to purchase--at substantially higher prices in the aftermarket--more than four times the

number of iManage shares than had been allocated in the IPO.  Id. at p. 19; 55.

3

10.   The Underwriter engaged in the Tie-in Agreements in order to guarantee record compensation while minimizing the risk normally attendant to underwriting securities in an unmanipulated and freely tradable marketplace.  Id. at ¶ 17.

11.   The statements contained in iManage's Registration Statement and Prospectus were materially false and misleading because they did not disclose the fact that the Underwriter would require the customers to commit to Tie-in Agreements.  Id. at ¶ 43.

12.   iManage participated with the Underwriter in each stage of the offering process, starting with the opening pitch and including the Road Show.  iManage was aware of, or was reckless in not knowing of, the "misconduct alleged herein."  Id.  at ¶ 56.

13.   iManage was motivated to and did benefit financially as a result of the sharp appreciation in value of their stock price.  Id.

14.   iManage had numerous interactions and contacts with the Underwriter prior to the IPO from which it knew or recklessly disregarded that the "manipulative and deceptive scheme described herein had taken place."  Id. at ¶ 58.

The Complaint alleges violations of federal securities law and Colorado State laws in connection with the initial public offering ("IPO") conducted on or about November 17, 1999, of 3,600,000 shares of iManage, Inc. ("iManage") and the trading of iManage common stock in the aftermarket.  *Complaint*, ¶ 1.

### III.   ANALYSIS

#### A.   Claim One: Violations of Federal Securities Law

Claim One alleges that the defendant violated Section 10(b) of the Securities Exchange Act of 1943 and Rule 10b-5 promulgated thereunder.  *Complaint*, p. 36.  Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>
> * * *
>
> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5.

The defendants assert that Claim One must be dismissed because the plaintiff has failed to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995. A claim for securities fraud must be stated with particularity. Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003). To state a claim for securities fraud under Rule 10b-5, the complaint must contain allegations which address the following five elements: (1) the

defendant made an untrue or misleading statement of material fact, or failed to state a material

fact necessary to make statements not misleading; (2) the statement complained of was made or

omitted in connection with the purchase or sale of securities; (3) the defendant acted with

scienter, that is with intent to defraud or recklessness; (4) the plaintiff relied on the misleading

statements; and (5) the plaintiff suffered damages as a result of her reliance.  Id. (citing Grossman

v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997)).

Congress passed the Private Securities Litigation Reform Act ("PSLRA") in 1995.  The

PSLRA increases the plaintiff's burden for pleading the first and third elements.  Id. at 1095; 15

U.S.C. § 78u-4(b)(1) and (2).

As to the first element, the PSLRA requires the following:

> [i]n any private action arising under this chapter in which the
> plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the
> statements made, in the light of the circumstances in which they
> were made, not misleading;
>
> the complaint shall specify each statement alleged to have been
> misleading, the reason or reasons why the statement is misleading,
> and, if an allegation regarding the statement or omission is made on
> information and belief, the complaint shall state with particularity all
> facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

When pleading the scienter element of a securities fraud claim, the PSLRA states:

> In any private action arising under this chapter in which the plaintiff
> may recover money damages only on proof that the defendant acted
> with a particular state of mind, the complaint shall, with respect to
> each act or omission alleged to violate this chapter, state with

particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind.

Id. at § 78u-4(b)(2).

The plaintiff claims that the Registration Statement and Prospectus were materially false

and misleading because iManage failed to disclose that the Underwriter required Tie-in

Agreements when allocating shares in the IPO. *Complaint*, ¶ 5.  The plaintiff further claims that

iManage knew of or recklessly disregarded the Tie-in Agreements through its close association

with the Underwriter.  Id. at ¶¶ 6, 5662.  The plaintiff pleads scienter as follows:

> 56.  The Defendants[] participated with the Underwriter in each
> stage of the offering process, starting with the opening "pitch" and
> including the "Road Show," and were aware of, or reckless in not
> knowing of the misconduct alleged herein.  By engaging in the
> misconduct alleged, the Defendants were able to parlay the
> spectacular increase in their market capitalization into unparalleled
> wealth.  The Issuer, as new publicly held corporation, benefited
> [sic] financially from the misconduct as the run up of their
> respective stock prices afforded them with substantial opportunities
> to utilize their stock as currency in connection with corporate
> acquisitions, and to raise even more money through add-on
> offerings.  Moreover, the individual Defendants were motivated to
> and did benefit financially as a result of the sharp appreciation in
> value of the respective Issuer's stock price.
>
> * * *
>
> 57.  As alleged herein, the Defendants acted with scienter in that
> they: (a) knowingly or recklessly engaged in acts and practices and
> a course of conduct which had the effect of artificially inflating the
> price of the Issuer's common stock in the aftermarket; (b)
> knowingly or recklessly disregarded that the Registration
> Statement/Prospectus as set forth herein was materially false and
> misleading; and/or (c) knowingly or recklessly disregarded the
> misconduct of the Underwriter alleged herein.
>
> 58.  The Defendants had numerous interactions and contacts with
> the Underwriter prior to the IPO from which they knew or

recklessly disregarded that the manipulative and deceptive scheme described herein had taken place.

59.  In this regard, the Underwriter provided detailed presentations to the Defendants regarding the registration process leading up to the IPO and the expected price performance in aftermarket trading based upon previous companies taken public by these underwriters. In addition, the Underwriter explained the process by which the Defendants could utilize the Issuer's publicly traded stock as currency in stock based acquisitions, the analyst coverage they would provide for the Issuer upon the successful completion of the IPO and the effect that such positive coverage would have on the aftermarket price of the Issuer's stock.  Such presentation also included a discussion of the potential for secondary or add-on offerings.

60.  Once the Defendants had determined to retain the Underwriter with respect to the Issuer's initial public offering, the Defendants worked closely with the Underwriter in preparing the Registration Statement/Prospectus, as well as generating interest in the IPO by speaking with various, but selected groups of investors.

61.  During the course of these presentations, known as "Road Shows," the Defendants learned of or recklessly disregarded the misconduct described herein.  In this regard, the Chief Executive Officer, the Chief Financial Officer and/or other high-ranking Issuer employees worked side by side with representatives of the Underwriter while visiting with several potential investors in a given city on a daily basis over a two to three week period to promote interest in the IPO.  These presentations were all scheduled by and attended by representatives of the Underwriter.

62.  As a result of the close interaction between the Defendants and the Underwriter, the Defendants learned of, became aware of or recklessly disregarded the misconduct described herein.

*Complaint*, ¶¶ 56-62.

"[T]he appropriate level of scienter in securities fraud cases is a mental state embracing intent to deceive, manipulate, or defraud, which includes recklessness." Fleming, 264 F.3d at 1259 (internal quotations and citations omitted).  "[T]o establish scienter in a securities fraud case

alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the

defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal

the potentially material fact would likely mislead investors.  The requirement of knowledge in this

context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that

was so obviously material that the defendant must have been aware both of its materiality and that

its non-disclosure would likely mislead investors." Id. at 1261.

The plaintiff has failed to plead specific facts giving rise to a strong inference of scienter

on the part of iManage.  Indeed, the majority of Complaint's allegations address the scienter of

the Underwriter.

A "strong inference" of scienter is a "conclusion logically based upon particular facts that

would convince a reasonable person that the defendant knew a statement was false or

misleading." Adams, 340 F.3d at 1105.  The Complaint alleges only that high-ranking iManage

officials worked closely with Underwriter representatives and, therefore, were aware of or should

have been aware of the Tie-in Agreements.  Although "[t]he scienter of the senior controlling

officers of a corporation may be attributed to the corporation itself to establish liability as a

primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the

scope of their apparent authority," id, at 1106, the plaintiff offers only conclusory allegations of

their knowledge.  The Complaint does not contain any specific factual allegations from which to

infer that any of the high-ranking officials of iManage had actual knowledge of the Tie-in

Agreements.

The plaintiff alleges that iManage was motivated to engage in the Tie-in Agreements so

that it could benefit financially from the artificially inflated the value of its stock and that it had

many opportunities to learn about the Underwriter's scheme through "detailed presentations" and

by working closely with the Underwriter.  Id. at ¶¶ 56, 58-63.  However, allegations of motive

and opportunity are viewed only in the context of the totality of the pleadings; they are not

sufficient in themselves to establish scienter.  Fleming, 264 F.3d 1261-62.  Because the Complaint

does not contain any other factual allegations giving rise to a strong inference of scienter on

behalf of iManage, the plaintiff's allegations of motive and opportunity, without more, do not

suffice to establish scienter.

I respectfully RECOMMEND that the Motion be GRANTED to the extent it seeks

dismissal of Claim One for failure to satisfy the heightened pleading requirements of the PSLRA.[2]

### B.  Claims Two and Three

In Claim Two, the plaintiff asserts that the same allegations constitute common law fraud

under Colorado law. *Complaint*, ¶¶ 78-90.  Claim Three asserts a claim for intentional infliction

of emotional distress under Colorado law.  Id. at ¶¶ 91-105.[3]

The sole basis for this Court's jurisdiction is 28 U.S.C. § 1331 (federal question). *Notice*

*of Removal of Civil Action Under 28 U.S.C. §§ 1331, 1441 and 1446* [Doc. #1, filed 8/9/06], ¶

6.[4]

This Court may decline to exercise supplemental jurisdiction over the plaintiff's state law

claims when it has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. §

---

[2]Because I find that the plaintiff has failed to adequately plead scienter, I do not address the remaining securities fraud pleading requirements.

[3]Claim Four is no longer extant because it was brought solely against the individual defendants.

[4]28 U.S.C. §§ 1441 and 1446 address removal of cases from state courts.

1367(c)(3).  Because the plaintiff has failed adequately to allege a violation of federal securities

law, I recommend that the Court decline to exercise supplemental jurisdiction over the remaining

state law claims.  I respectfully RECOMMEND that Claims Two and Three be DISMISSED.[5]

## IV.   CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED and that the Complaint be

dismissed in its entirety.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and

Fed.R.Civ.P. 72(b), the parties have 10 days after service of this recommendation to serve and file

specific, written objections.  A party's failure to serve and file specific, written objections waives

*de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); Thomas v. Arn,

474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal

questions.  In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A

party's objections to this recommendation must be both timely and specific to preserve an issue

for *de novo* review by the district court or for appellate review.  United States v. One Parcel of

Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

---

[5]As a result of my determination that Claims Two and Three must be dismissed on the foregoing grounds, I do not address the defendant's remaining arguments.

Dated September 11, 2007.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge